**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SHEET METAL WORKERS' INTERNATIONAL ASSOCIATION, LOCAL UNION NO. 361, Respondent.**

No. 72-2029.

United States Court of Appeals, Fifth Circuit.

April 26, 1973.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., Washington, D. C., Charles M. Paschal, Jr., Director, Region 15, N.L.R.B., New Orleans, La., John H. Ferguson, N.L.R.B., Washington, D. C., for petitioner.

Charles M. Peters, Shreveport, La., for respondent.

Before GEWIN, GOLDBERG and DYER, Circuit Judges.

GEWIN, Circuit Judge:

■ Pursuant to § 10(e) of the National Labor Relations Act, as amended 29 U.S.C. § 151 et seq., the Board seeks enforcement of its order against Sheet Metal Workers' International Association, Local Union No. 361 (Local 361). This case arose from Local 361's assessment of a $2,500 fine and permanent expulsion of one of its members, El-mer C. Langston, a sheet metal superintendent for Langston & Co., Inc. (the Company).[1] On February 24, 1971, Langston, as an individual, filed an unfair labor practice charge against Local 361, alleging that the action taken against him violated § 8(b)(1)(A) and (B) and § 8(b)(2) of the Act, 29 U.S.C. §§ 158(b)(1)(A), (B), and (b)(2). A hearing was conducted before a Trial Examiner who recommended that the complaint be dismissed as to all charges. The Board reversed. Local 361 was found guilty of the unfair labor practices, as charged, the Board having concluded that Langston was fined and expelled in violation of § 8(b)(1)(B) for exercising permissible and normal supervisory functions in making certain employee discharges and in violation of §§ 8(b)(2) and 8(b)(1)(A) for hiring members of a rival union at a particular job site instead of members of Local 361. A cease and desist order was issued accordingly together with an order for other appropriate affirmative relief. We fully enforce the Board's order.

I—*Section 8(b)(1)(B) Violation*

Section 8(b)(1)(B) makes it an unfair labor practice for a labor organization "to restrain or coerce . . . an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances."[2] The acts which formed the basis of these charges allegedly occurred during a dispute between the Company and Local 361, when Elmer in his role as supervisor, had on several occasions taken worksite action against fellow members of Local 361. In the disciplinary proceedings, Local 361 charged that Elmer had slandered the Union by dismissing union members for

---

1. In this capacity, Elmer did all the hiring and firing and adjusted grievances in behalf of Langston & Co. He is clearly a "supervisor" within the meaning of § 2 (11), 29 U.S.C. § 152(11), which includes: "any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."

2. 29 U.S.C. § 158(b)(1)(B).

drunkenness, had broken down working conditions by firing union members without just cause, had encouraged the company to hire members of a rival union and had "made the Local Union look sick in the eyes of the public."

Local 361 does not contest the fact that a prima facie showing of an 8(b)(1)(B) violation appears from the record. It argues, however, that the disciplinary action taken against Elmer was justified by its good faith belief that he was committing unfair labor practices against his own union. We do not agree.

The Trial Examiner missed the point when he gratuitously suggested that under the facts of this case to hold the union guilty of an 8(b)(1)(B) violation "would in effect amount to rewarding Elmer for committing or attempting to commit an unfair labor practice against his union." Local 361's good faith is immaterial to the issue now before this court. This conclusion is reinforced by the existence of legal remedies for any unfair labor practices committed by the employer through its supervisory personnel. As the Board pointed out, "[a] union faced with such concerns is not without remedies. Contractual violations can be remedied through appropriate grievance procedures. Violations of this Act may be pursued by filing charges with this Agency. Self-help, through the exercise of statutorily protected strike and picketing activity, may also be available." The implied corollary of this reasoning is that Local 361's disciplinary measures cannot be justified as a supposedly necessary self-help tactic.

The only circumstances in which union discipline of a supervisor member is permissible is when the discipline concerns a purely internal union matter,[3] and such is not the case here. As Local 361's charges indicate, the firing and expulsion of Elmer were based upon acts which he carried out in his capacity as superintendent of the sheet metal crew. The Board properly found that this was done to retaliate against him for the performance of duties indigenous to his position as a management representative of the Company, and hence amounted to coercion of the employer in contravention of the provisions of section 8(b)(1)(B). See Meat Cutters Union Local 81 v. NLRB, 147 U.S. App.D.C. 375, 458 F.2d 794 (1972); NLRB v. New Mexico District Council of Carpenters, 454 F.2d 1116 (10th Cir. 1972); Dallas Mailers Union, Local 143 v. NLRB, 144 U.S.App.D.C. 254, 445 F. 2d 730 (1971).

## II—*Section 8(b)(1)(A) and 8(b)(2) Violations*

Elmer's unfair labor practice charges under Section 8(b)(1)(A) and (b)(2) arose from disciplinary action taken against him by Local 361 for hiring members of a rival union as a part of an alleged conspiracy to oust Local 361 as bargaining representative of the Company's sheet metal workers.[4] Section 8(b)(2) provides in relevant part that it is an unfair labor practice for a labor organization "to cause or attempt to cause an employer to discriminate against an employee in violation of [section 8(a)(3)]". The latter provision prohibits "discrimination in regard to hire or tenure of employment or any

---

3. See, e. g., Meat Cutters Union, Local 81 v. N. L. R. B., 147 U.S.App.D.C. 375, 458 F.2d 794, 800–801 (1972); N. L. R. B. v. Sheet Metal Workers' International Association, 430 F.2d 1348, 1350 (10th Cir. 1970).

4. The charge states in pertinent part: "Bro. Elmer Langston was a party to and knowingly agreed to work with and encourage the Company to hire Employee's

[sic] of Allied Federation of Unions Local 101. Bro. Elmer Langston membership No. 339041 was and still is Foreman, with the right to hire and fire Employee's. The above Employee's were hired and placed to work at Jena, Louisiana. Bro. Elmer Langston stated that they were members in good standing of the Union, but after checking they were members of Local No. 101, Allied Federation of Union Local No. 101, Article 17, Sec. 1(f)."

term or condition of employment to encourage or discourage membership in any labor organization." Section 8(b)(1)(A) makes it unlawful for a union to restrain or coerce employees in the exercise of their section 7 right to join or to refrain from joining a labor organization.

The Trial Examiner found that Local 361 did not violate these provisions as alleged by Elmer. From his review of the testimony, he made the sweeping determination that the entire Langston Family employed by the Company, with the possible *exception* of Elmer himself, became involved in a surreptitious scheme "whose purpose quite obviously was to supplant Local 361 as the recognized bargaining agent of the employees of L. & Co. at Jena if not at all L. & Co. jobs, to eliminate the existing contractual relationship between L. & Co. and Local 361 at Jena, at least, and to replace Local 361 as such bargaining agent with District 101 (the rival union) if necessary." These facts, in the Trial Examiner's view, removed the case from 8(b)(1)(A) entirely and made it abundantly clear that "if anyone was attempting 'to restrain or coerce employees in the exercise of the rights guaranteed in Section 7,' it was L. & Co. and not Local 361."

The Trial Examiner then stated that it was unimportant to his decision whether Elmer was actually privy to the clandestine scheme to oust Local 361. His reason was very simply that Local 361 probably didn't know about the scheme when it filed the charges against Elmer on July 17, 1970. Nonetheless, on the basis of what was known by the union on that date, apart from any consideration of an allegedly illegal conspiracy by the company, Local 361 was found to have had good cause to believe that:

> ". . . [A]s sheet metal department Superintendent, Elmer had hired and deliberately retained District 101 members, Lloyd and Gauthier, far beyond the time limits set in the existing collective-bargaining agreement

between L & Co. and Local 361 and that Elmer was doing this in an effort to displace Local 361 at Jena with the more favored L & Co. union, District 101. In other words Local 361 could reasonably believe that Elmer was attempting to get rid of Local 361 despite its contract with L & Co. and replace it surreptitiously with District 101. In short the evidence here proves that the proverbial reasonable man, based on the facts then known to Local 361, had good cause to believe that Elmer, with or without L & Co.'s participation, was busily engaged in activities favoring District 101 which amounted to unfair labor practices in violation of Section 8(a)(2) and (1) of the Act as well as in violation of the terms of the existing collective-bargaining agreement. If Elmer's actions were not violative of Section 8(a)(2) of the Act, at least it appeared that he was deliberately engaged, or had engaged, in making a "sweetheart deal" with District 101, the hated rival of Local 361."

As an additional ground for dismissing the complaint, the Trial Examiner also found that the dual unionism charges filed against Elmer had nothing to do with the enforcement or interpretation of the collective-bargaining agreement then in effect between the Company and Local 361. On the contrary, Local 361's grievances against Elmer were considered to be "exclusively a matter of internal union concern relating, without exception, to the relationship between the Union and one of its members."

In reversing the Trial Examiner, the Board reasoned:

> ". . . [I]t is our view that the Trial Examiner's explanation does not square with the Union allegations against Elmer Langston. Those allegations make no complaint of a failure to enforce a union-security clause *after* the employees were hired. Instead, they complain that 'The above Employee's [sic] were hired and placed to work at Jena, Louisiana.' The Un-

ion's complaint, then, was that Elmer had sanctioned the hiring of these men. And why was this hiring offensive to the Union? Because, to paraphrase the rest of the allegations, they were not members of Respondent (Local 361) but, instead, were members of another union. Thus, Elmer's sin, as the Union saw it, was that he failed to require membership in Respondent as a condition preceding employment. We therefore find that Respondent's discipline of Langston was, in part, an attempt to cause him as the Employer's representative, unlawfully to discriminate against applicants for employment in violation of Section 8(a)(3) of the Act. We find that, by engaging in such conduct, Respondent violated Section 8(b)(1)(A) and (2) of the Act."

■ The Board's decision, in our opinion, is fundamentally sound. Union rules requiring that their supervisor members hire only fellow union members have long been associated with illegal efforts to reinstate the closed shop outlawed by the Taft-Hartley Amendments of 1947. *See, e.g.,* NLRB v. Millrights' Local 2232, 277 F.2d 217 (5th Cir. 1960), cert. denied, 366 U.S. 908, 81 S. Ct. 1083, 6 L.Ed.2d 234 (1961). Likewise, union fines or expulsion of a supervisor member for failing to require membership as a condition of employment is an attempt to discriminate against non-member applicants in violation of Section 8(a)(3) and hence a violation of Sections 8(b)(2) and 8(b)(1)(A). N.L.R.B. v. New Mexico District Council of Carpenters, 454 F.2d 1116, 1119 (10th Cir. 1972).

At this juncture, it is necessary only to add that the Board did not improperly disregard the Trial Examiner's findings of fact and credibility determinations, as the union now contends. The Trial Examiner in his opinion greatly emphasized Local 361's reasonable belief that Elmer was part of a clandestine scheme designed to replace it as the bargaining representative of the employees of the Company. Feeling that Elmer should not profit from such wrongdoing, he concluded that this reasonable belief would constitute a complete defense to the unfair labor practice charges at issue. The Board rejected this conclusion as a *matter of law*, regardless of whether the conspiratorial scheme existed as a matter of fact. For reasons which are adequately stated in the first section of this opinion, we believe that the Board's rejection of the union's good faith or reasonable belief defense rests on solid legal footing.[5]

## CONCLUSION

The order of the National Labor Relations Board requiring Local 361 to cease and desist from certain described unfair labor practices against the Company and to rescind all disciplinary actions taken against Elmer Langston is hereby

Enforced.

5. The Board also found on the basis of the uncontradicted testimony of Earl Langston, president of Langston & Co., that a manpower shortage occasioned by Local 361 necessitated the concentration of all available workers at the England worksite *after* February 18, 1970 and eventually led to the hiring of the two workers at Jena who were not Local 361 members. The Trial Examiner had previously rejected this testimony on the ground that it lacked corroboration. Although, outside of Earl's testimony, the record provides something less than overwhelming support for the Board's finding in this connection, we are not prepared to say either that Earl's testimony was uncorroborated or that such other evidence was insubstantial.